**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| COMCAST CABLE COMMUNICATIONS, LLC d/b/a XFINITY, and COMCAST CORPORATION, Plaintiffs, | ) | CIVIL ACTION |
| v. | ) | FILE NO. _______________ |
| TEXANBULL, INC., MUHAMMAD JUNAID KHAN, XYZ COMPANIES 1-10, and JOHN DOES 1-10, Defendants. | ) | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiffs Comcast Cable Communications, LLC d/b/a XFINITY and Comcast Corporation (collectively, "Plaintiffs" or "XFINITY"), sue Defendants Texanbull Inc., Muhammad Junaid Khan, XYZ Companies 1-10, and John Does 1-10 (collectively, "Defendants") and state:

**BACKGROUND**

1. Since learning that fraudsters, like Defendants, are using its name to defraud consumers, XFINITY has been taking steps to combat the extremely harmful scheme. For example, XFINITY expends significant resources to respond to existing and potential customer complaints of imposter fraud scams. In addition to attempting to salvage the customer relationships damaged by fraudsters, XFINITY collects and analyzes the data provided in customer reports of imposter fraud. XFINITY also works with law enforcement, regulators, and industry groups to combat imposter fraud schemes. It routinely posts and circulates fraud alerts for its customers and the public on its websites, in an effort to educate consumers to be alert to the potential dangers of fraud. Finally, XFINITY dedicates substantial internal resources, as well as hiring external investigators and retaining the undersigned counsel to take legal action to pursue those perpetrating imposter fraud schemes.

2. Defendants are engaged in a scheme to impersonate XFINITY in an effort to defraud unknowing consumers in the United States into providing them with prepaid cards, checks, electronic checks, debit or credit cards, and other forms of payment, believing that they are: obtaining discounted or free XFINITY services, paying their XFINITY account balance or upgrading their XFINITY equipment (hereinafter the "Imposter Fraud Scheme" or the "Scheme"). This action seeks to end this ongoing fraudulent scheme by Defendants and their co-conspirators against XFINITY, and its existing and potential customers, and to compensate Plaintiffs for damages caused by this fraud.

3. Comcast Corporation is a global media and technology company with two primary business categories: Connectivity & Platforms and Content & Experiences. Under Connectivity & Platforms, Comcast Cable Communications, LLC is a leading provider of broadband, video, voice, wireless, and other services to customers in the United States under the XFINITY brand. For nearly 60 years, the Comcast family of companies has invested significant time and resources to become a household name. To maintain its position in the market, Comcast continuously develops and updates its network, technologies, video programming offerings, and customer experience, providing best-in-class services, content, and digital entertainment offerings. Its reputation as one of the largest communications and media companies in the country makes it a target for fraud, like that perpetrated by Defendants.

4. Defendants and their co-conspirators are perpetrators of the Imposter Fraud Scheme, in which they misuse XFINITY's name and reputation for their personal financial gain. After engaging existing or potential XFINITY customers to offer them fictional free or significantly discounted XFINITY services or products, demanding payment on their XFINITY accounts, and/or threatening to terminate their XFINITY service if they do not purchase equipment upgrades, Defendants take the consumer's money, typically in the form of PayPal or Zelle payments, prepaid or credit cards, or physical or electronic checks. They keep the PayPal and Zelle payments and launder the cards, cash the checks, and fraudulently use the bank account and credit card information. Having successfully duped the consumers, they disappear with their money.

Defendants leave the consumers confused, angry, and without the promised free or discounted XFINITY products and/or services or account credit, harming both the consumers and Plaintiffs.

5.      As with most imposter fraud schemes, Defendants' Imposter Fraud Scheme involves a number of steps and co-conspirators, but follows repeated patterns:

a.      Fraudsters identify existing, former, or potential XFINITY customers who may be in the market for digital entertainment services (*e.g.*, people moving, new homebuyers, or those looking to install televisions and/or home entertainment systems). The fraudsters often create fake websites to collect consumer information or they scrape the dark web to identify the information of viable consumer targets for the Imposter Fraud Scheme. Then they either sell the lead lists to other fraudsters or they directly contact these consumers, by text message or phone call using Voice over Internet Protocol (VoIP) service. VoIP dramatically decreases the cost of making such calls and allows them to manipulate their Caller ID (e.g., falsely reading "XFINITY" or "Comcast").

b.      When an individual responds, the fraudsters impersonate XFINITY representatives and tell the consumers that they have been selected for a special, time-sensitive XFINITY promotion that is about to expire, thus requiring the consumers to act quickly. It is common for the fake promotion to offer 30% - 50% or more off XFINITY service for between 6-24 months or even for life, and sometimes include free premium channels to make the purported deal more attractive. XFINITY customers are told that they are being offered a special bill pay discount that will reduce their current XFINITY account balance, but only if they immediately make a payment. Under another fraud ploy, the fraudsters threaten to disrupt XFINITY customers' services if they do not immediately pay to "upgrade" their equipment—either through a device that is promised to be delivered in the next several business days or through a "required remote upgrade" to their current equipment. Customers may receive multiple subsequent calls, each time seeking more money for "additional necessary upgrades," each accompanied by the threat that they will lose their XFINITY services if they do not act.

c.      Once the consumer is deceived, the fraudsters elicit personal identification information, and, if the consumer is already an XFINITY customer, gather the customer's account

access information. In the case of an existing customer, the fraudsters put the customer on hold while they use the identification information provided by the customer to unlawfully access the individual's XFINITY account. Sometimes the fraudsters make a full or partial "payment" on a stolen credit card or add premium channels to the account (at full cost) to add credibility to the fraud.

      d.     When prepaid cards are sought in payment, the fraudster tells the consumer that the promotion is in partnership with another company, such as Target, and, therefore, to qualify for the benefits of the dramatic discount, the customer will need to prepay the discounted amount due in prepaid cards issued by the promotion partner. The consumer is provided a total amount to acquire in prepaid cards, another number to call with the prepaid card information, and the fraudster's "employee number." The consumer rushes out to buy prepaid cards, calls the number provided by the fraudster, which is answered "XFINITY," and provides the prepaid card information.  The fraudster immediately drains the prepaid cards of funds.

      e.     Fraudsters are also increasingly looking for payment in the form of credit cards, physical checks and echecks, as they can not only collect money under the Imposter Fraud Scheme, but also target the entire bank account or credit line. They attempt to make charges or drain the account's funds, or they resell the credit card information or images of the checks online, for other fraudsters to use. In the case of checks and credit cards, the fraudsters prevent anticipated holds or reversed charges by misrepresenting that they are an authorized partner of XFINITY, and warning the consumer not to be confused or alarmed by a different name on the charge.

      f.     The consumer never receives the promised promotions, bill credit or equipment. Instead, victims of the Imposter Fraud Scheme call XFINITY Customer Care confused and angry and demand the promotion or a bill reduction or they will terminate their service. Others recognize and are embarrassed that they were scammed, but nonetheless associate XFINITY with the experience and quietly move to another provider. Even consumers who did not fall victim to the fraud contact XFINITY Customer Care to report the Scheme, and/or report their negative opinion of XFINITY, thereby using valuable Comcast time and resources. Still others targeted for this fraud report their

negative opinion of XFINITY on Comcast's online customer support forum or public websites dedicated to consumer complaints, such as nomorobo.com, 800notes.com, and scammer.info.

6.      Although the fraudsters engaged in the XFINITY Imposter Scheme may collect customer information on the dark web, they openly do business in Facebook groups, LinkedIn chats, and on employment websites such as Upwork. They talk openly about needing scam scripts; merchants to launder payments; lists of customer information; VoIP services; computer software "portals" that keep track of calls and payments; and employees to run their scams, which they call "campaigns." Examples of such communications are attached as **Exhibit A**. The fraudsters brag about their experience and expertise and highlight their specialties with particular imposter fraud scams. *See id*. While most call centers are located in Pakistan, many of the call center owners, like Defendants, and the VoIP providers are located in the United States, as are the companies that ultimately cash out checks, as well as prepaid and credit cards.

7.      In today's e-commerce world, imposter fraud has grown tremendously, particularly in the last few years. According to the FTC in its most recent report on the topic, consumer-reported fraud grew 70% between 2020 and 2021, for a total of $5.8 billion in consumer losses. The FTC received over 2.8 million consumer reports of fraud in 2021 "with the most commonly reported category once again being imposter scams." https://www.ftc.gov/news-events/news/press-releases/2022/02/new-data-shows-ftc-received-28-million-fraud-reports-consumers-2021-0. In the first nine months of 2021, consumers reported losing $148 million in prepaid card scams, like the one at issue here. https://www.ftc.gov/news-events/news/press-releases/2021/ 12/ftc-data-show-major-increase-gift-cards-scam-payment-method. There is no industry or government agency, and virtually no large, well-known company, which has not been the target of imposter fraud. The Imposter Fraud Scheme aimed at XFINITY and its customers has been the subject of news reports. *See, e.g.*, https://www.youtube.com/watch?v=8XFzUwo3Wf8, https://www.consumeraffairs.com/news/are-you-an-XFINITY-customer-then-look-out-for-this-scam-04 0423.html.

8.      In addition to violating numerous state laws and common law rights of XFINITY and its customers, in perpetrating the Imposter Fraud Scheme, Defendants are engaged in an

unlawful enterprise to access XFINITY's protected computer systems, traffic in protected and confidential computer passwords, willfully infringe Comcast Corporation's trademarks, and falsely impersonate and advertise as XFINITY.

9. The Imposter Fraud Scheme causes substantial harm to XFINITY and its customers. In addition to the pecuniary losses and costs associated with addressing the Scheme, the misconduct by Defendants and their co-conspirators significantly harms XFINITY's relationships with its customers and others. For example, legitimate customers who are targeted by Defendants and their co-conspirators are distressed and blame XFINITY, the company whose name Defendants co-opted in perpetrating their theft. XFINITY is also forced to defend demands and lawsuits based not on its own acts, but on Defendants' and their co-conspirators' false advertising, impersonation, and other unlawful acts. Defendants cause substantial financial losses as well as damage to XFINITY's brand, image, and relationships.

10. XFINITY values its hard-earned reputation as a leading provider of communications and media services and holds its customers in the highest regard. Filing this lawsuit, and others like it, is an important aspect of XFINITY's ongoing commitment to protect its brand and its customers from those that seek to profit from the illegal Imposter Fraud Scheme.

11. XFINITY seeks to recover damages for ongoing harm suffered as a result of Defendants' Imposter Fraud Scheme and to obtain an injunction prohibiting Defendants from continuing to engage in the Scheme.

12. All conditions precedent to this action have been performed, waived or excused.

13. Plaintiffs have retained the undersigned attorneys to represent them in this action and have agreed to pay their attorneys a reasonable fee for their services.

**PARTIES, JURISDICTION, AND VENUE**

14. Plaintiff Comcast Cable Communications, LLC d/b/a XFINITY ("XFINITY"), is a Delaware limited liability company that maintains its principal place of business in Philadelphia, Pennsylvania. The sole member of Comcast Cable Communications, LLC is Comcast Holdings Corporation, a Pennsylvania corporation with its principal place of business in Philadelphia,

Pennsylvania. Comcast Holdings Corporation is a wholly-owned direct subsidiary of Comcast Corporation.

15.     Plaintiff Comcast Corporation ("Comcast") is a Pennsylvania corporation, with its principal place of business in Philadelphia, Pennsylvania.

16.     Defendant Texanbull, Inc. ("Texanbull") is a Texas corporation with its principal place of business in Stafford, Texas. As reflected in documents maintained by the Texas Secretary of State, Defendant Muhammad Junaid Khan is the Registered Agent and Director for Texanbull, with a principal address in Stafford, Texas 77477.

17.     Defendant Muhammad Junaid Khan ("Khan") is an individual residing in Stafford, Texas.  Khan is a director of Texanbull, and is personally engaged in, and helps facilitate, the improper conduct described herein.

18.     Defendants use their phone numbers, websites, and companies interchangeably and as co-conspirators to further their Imposter Fraud Scheme on behalf of affiliate Synapse Digital Pvt. in Pakistan (*e.g.*, texanbull.com, texanbulls.com, texanbull.store, speedycabledeals.com, broadbandtvcable.com) and frequently change or add new phone numbers, websites, and companies to conceal their unlawful activities and hide assets.

19.     Other non-defendant co-conspirators also assist and participate in the Imposter Fraud Scheme, such as Audaz E Itinerante Unipessoal LDA, a merchant processing company in Portugal, which launders payments and money.

20.     Yet to be identified Defendants John Does 1-10 are present and/or doing business in Texas and are engaged in illicit conduct and business transactions in the Southern District of Texas, as alleged herein.  The identities of the various John Doe defendants are not presently known to Plaintiffs and the Complaint will be amended to include the name or names of these individuals as such information becomes available.

21.     Yet to be identified Defendants XYZ Companies 1-10, through their agents, servants, and employees are present and/or doing business in Texas, and are engaged in illicit conduct and business transactions in the Southern District of Texas, as alleged herein.  The identities of such

Defendants XYZ Companies are not presently known to Plaintiffs and the Complaint will be amended to include the names of the actual defendants as such information becomes available.

22. At all times relevant hereto, Defendants failed to observe the corporate formalities required by law, acted as a single entity, and shared resources and corporate infrastructure, including, but not limited to computer services, telephone numbers, employees, and office space. Accordingly, each Defendant is liable for the acts and omissions of every other Defendant pursuant to piercing of the corporate veil, among other legal principles.

23. Each Defendant is the partner, joint venturer, accomplice, agent, and alter ego of each of the other Defendants.

24. Each Defendant is equally liable in relation to the illegal activities described herein on the basis of that Defendants' material participation in the Scheme.

25. Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§1331, 1332, and 1338 because Plaintiffs' claims for violation of the United States Trademark Act, Title 15 of the United States Code and the Computer Fraud and Abuse Act, 18 U.S.C. §1030, *et seq*., arise under federal law, and because diversity exists between the parties and the amount in controversy exceeds $75,000 exclusive of costs, fees, and interest. Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

26. Defendants are subject to the personal jurisdiction of this Court because they reside in Texas, regularly transact business in Texas, and/or committed tortious acts in Texas.

27. Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendants reside in this District and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

**XFINITY BUSINESS MODEL**

28. XFINITY provides broadband Internet access, video, voice, wireless, security, home automation, and other services, individually and as bundled services at a discounted rate, to

over 30 million customers in the United States. They provide these customers with the highest quality services with innovative pricing plans and self-service tools.

29. XFINITY provides its customers with the choice of watching digital entertainment from virtually anywhere – on televisions at home, on computers using the XFINITY streaming service or on mobile devices via the XFINITY mobile app. In addition to its basic channel lineup, XFINITY offers, *inter alia*, On Demand titles and premium channels. Customers tailor their programming packages to meet their needs and can pay for their XFINITY service by debit or credit card, check, money order, ACH transfer, or by cash at a local XFINITY store.

30. In addition to being available online and through telesales, XFINITY products and services are available through authorized XFINITY dealers and retailers in the United States.

31. XFINITY's business model is based upon the ability to deliver affordable, quality products and services to consumers. From time to time, XFINITY provides financial incentives to attract new customers and retain current customers, *e.g.*, prepaid cards, free Wi-Fi equipment for a certain period of time, or Peacock Premium service at no charge. XFINITY is able to recoup these incentives through revenue earned on the monthly services it provides. However, XFINITY has never offered a promotion under which its customers can reduce the cost of their entertainment package by 50%. Nor has XFINITY ever represented to or threatened its customers that their XFINITY service will stop functioning if they do not immediately pay to "upgrade" their equipment.

32. XFINITY's unique products and services, combined with its reputation and state-of-the-art technology, make it a target for the Imposter Fraud Scheme being conducted by Defendants and their co-conspirators.

**PLAINTIFFS' TRADEMARK RIGHTS**

33. Comcast Corporation owns the standard character COMCAST® and XFINITY® marks and the stylized XFINITY® and X® marks (collectively, the "XFINITY Marks"). A

detailed chart summarizing Comcast Corporation's U.S. federal trademark registrations is attached as **Exhibit B**.[1] The stylized XFINITY® and X® marks are depicted below:

34. As a result of the high quality of XFINITY's products, services, sales, promotion, and advertising thereof, the XFINITY Marks have become an intrinsic part of the valuable goodwill and property of Comcast Corporation. The XFINITY Marks are well known and established to customers and the trade as symbols identifying and distinguishing XFINITY's products and services, and signifying distinctive products and services of high quality. Only Plaintiffs and their authorized, affiliated agents or partners are permitted to use the XFINITY Marks. The XFINITY Marks are valid, distinctive, protectable, famous, have acquired secondary meaning, and are associated exclusively with Comcast Corporation.

35. Defendants are not in any way or for any purpose affiliated with Plaintiffs and, therefore, cannot lawfully use the XFINITY Marks.

36. Defendants are not authorized to use the XFINITY Marks in any way or for any purpose.

37. Defendants' unlawful use of the XFINITY Marks began after the XFINITY Marks became famous and acquired distinctiveness.

## DEFENDANTS' MISCONDUCT

38. Although each Defendant and co-conspirator may participate in less than all of the steps in the Imposter Fraud Scheme, they are reliant on each other to execute and profit from the Imposter Fraud Scheme. Therefore, every act by a Defendant and/or co-conspirator in furtherance of the conspiracy renders that Defendant or co-conspirator liable to XFINITY for the harm caused by the entire Imposter Fraud Scheme.

39. The Imposter Fraud Scheme includes the following bad actors:

[1] Copies of the Certificates of Registration (where applicable), TSDR status pages, and ownership status pages for the Comcast Marks issued by the United States Patent and Trademark Office are attached as **Composite Exhibit C**.

- **Lead List Generators and Traffickers**. Lead Lists are lists of purported XFINITY customers, usually with personal information such as name, phone number, address, account number, balance, and any other information the generators can gather. They collect this information in several ways, including through social engineering texts or calls to consumers, phishing emails and websites intended to lure consumers to submit their information, and by scouring the dark web for relevant information. Once the Lead List Generators gather and sort sufficient customer data, they sell the lead lists to Call Centers.

- **Call Centers**. Call Centers, like Defendants, are the entities that utilize Lead Lists to contact current and prospective XFINITY customers. The individuals at the Call Centers dial the numbers on the Lead List and follow a script to convince consumers to provide them with money – usually credit or prepaid cards or physical or e-checks, and occasionally PayPal payments – in exchange for free or significantly discounted XFINITY services, upgraded equipment or to pay their XFINITY bills.

- **Co-working Space/Portals**. Some Call Centers do not have their own space or equipment to make fraud calls. "Co-working" facilities that specialize in servicing those engaged in imposter fraud provide the Call Center with a furnished room, computers, internet connection, and headsets. A "portal" provides a ready-made Imposter Fraud Scheme, including software to track calls and incoming funds, and will often provide a "clean" IP address and Lead Lists –the Call Center team then starts dialing unsuspecting consumers.

- **Merchants**. Once the Call Centers have convinced existing or prospective XFINITY customers to provide them with monies, the payments are laundered through a Merchant. The Merchant collects the card or check information, typically through a web interface or through an email or chat message, and disburses funds to the Call Centers through PayPal, cryptocurrency, Western Union, Zelle, MoneyGram, and similar electronic payment methods. The Merchant can take as much as half of the amount being laundered as a fee, depending on the level of complexity or risk. The Merchant then uses companies

like PayPal, Authorize.net, and Elavon, to cash out the checks and card payments and may resell the customer credit card or banking information to other fraudsters.

- **VoIP Service Providers**. VoIP service, or Internet protocol-based dialing, is essential to the Imposter Fraud Scheme. VoIP allows Lead List Generators and Call Centers to dial U.S. consumers from anywhere in the world at a *de minimis* cost, and to change the caller ID to conceal and misrepresent their identities. While some fraudsters may sidestep protocols implemented by well-meaning VoIP providers, other VoIP providers intentionally turn a blind eye to Defendants and their co-conspirators exploiting their platform, and still others purposefully service and profit from this fraud. *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2024/01/xcast-labs-will-be-banned-supporting-illegal-telemarketing-practices-settle-ftc-charges-it-assisted (VoIP settles $10M FTC case for $10M for acting as a gateway for fraud calls even after being warned of the illegal traffic.)

40.     Defendants and their co-conspirators are knowingly and willfully engaged in the Imposter Fraud Scheme. Because of the complex nature of fraud schemes, the full extent of Defendants' Imposter Fraud Scheme activities is not yet known, however, Defendants are actively involved in several integral components of the conspiracy, including operating call centers that specialize in XFINITY promotional discount, equipment upgrade, and billing scams, which are discussed *infra*.

41.     XFINITY believes it uncovered only a fraction of the fraud perpetrated by Defendants against XFINITY and its customers.

42.     At least 18 Comcast customers have reported the Imposter Fraud Scheme being operated by Khan and his large, well-staffed company, Texanbull, in the last year. Khan's numerous websites, which all identify a connection to Texanbull, lure consumers to share their personal information through fake offers of special discounts on XFINITY cable and internet services.

43.     In addition, Texanbull, purporting to be an affiliate of XFINITY, calls XFINITY customers, offering bill and service discounts, as well as "required" equipment upgrades, but only if the customer pays them immediately by providing a prepaid or credit card, bank information or

a payment by Zelle or through a PayPal link sent via text message to the customer. Payments obtained by Defendants are processed through Audaz E Itinerante Unipessoal LDA, a Portuguese company, and customers, convinced by Texanbull employees that the processor works for XFINITY, do not attempt to stop or reverse payments. Customers only learn later, when they attempt to determine why they have not been credited for payments to XFINITY, that they were defrauded and the funds stolen by Defendants.

44. In October 2023, customers began reporting to XFINITY that they made credit card payments on their XFINITY account balances or for equipment "repair" services that were not reflected in their accounts. According to the customers, they made payments over the phone or through a link provided to them by self-described "XFINITY/Comcast" representatives at a phone number that returns to Texanbull. One customer specifically identified Texanbull, Inc. as the entity taking the payments, purportedly on behalf of XFINITY. In addition to reporting Defendants' Imposter Fraud Scheme to XFINIFY, customers report Defendants' fraud on public consumer forums, including scammer.info and Robokiller.

45. In addition to engaging in efforts to defraud XFINITY customers by posing as Plaintiffs or Plaintiffs' authorized agent, Defendants use numerous websites as bait to collect personal information from consumers interested in cable and internet services, including XFINITY. (*e.g.*, texanbull.com, texanbulls.com, texanbull.store, speedycabledeals.com, broadbandtvcable.com). Screenshot samples of Defendants' websites are attached in **Exhibit D**. These websites all identify their physical address as the registered address of Texanbull, which is also the residential address of Defendant Khan. On information and belief, Defendants create tailored Lead Lists from the XFINITY customer data that they collect, which they use and/or sell to other Call Centers to further advance their Imposter Fraud Scheme.

46. When Defendants' websites and phone numbers are no longer effective in luring and confusing XFINITY customers, Defendants retire them, and they start with new ones.

47. Investigators for Plaintiffs called the phone number reported by XFINITY customers and were greeted each time by a different Texanbull "agent," clearly in a call center,

who identified themselves as "XFINITY/Comcast" each time. While they answer the phone as "XFINITY/Comcast," the Caller Id accurately identified them as "Texan Bull, Inc." When questioned as to the discrepancy, Defendants divert XFINITY customers' concerns by falsely representing that they are an authorized agent of XFINITY.

48. On November 14, 2023, an investigator for XFINITY contacted Defendants on their primary number, 430.255.9695 and was offered a discount on the balance due to Comcast, provided payment was made at that time. The investigator was told that a payment link would be texted. A copy of the invoice is attached as **Exhibit E**. After the call, the Texanbull employee sent over 40 text messages to the investigator in an effort to collect payment. When asked why the invoice was in the name of another entity, the "agent," who identified himself as "Steve from Comcast," responded that the payment "is for Comcast" and the different name is because it is "just a payment processor":



49. On November 15, 2023 XFINITY's investigators again contacted Defendants at 430.255.9695. A male answered and stated that his name was "Andrew Dawson." Defendants' "agent" asked for the investigator's Comcast account number and the last 4 social security number digits. He accessed the undercover account, confirmed the balance, and offered a $40 discount on the outstanding balance, if paid at that time. He instructed the investigator to pay while on the phone using CashApp, Zelle, or by providing him with the investigator's banking information.

50. In another call occurring on November 15, 2023, investigators on behalf of XFINITY contacted Defendants at telephone number 856.631.9994. When asked what Texanbull does, the "agent" who answered said that Texanbull is a company that works on behalf of Comcast to "provide promotions." He volunteered: "it is very legit and there is nothing to worry about." When asked for details about available XFINITY promotions, he said his team would call the investigator back.

51. Defendants employed a virtually identical process in each interaction with the investigator, which matched many of the actions reported by defrauded XFINITY customers:

- Defendants offer a discount to the customer's XFINITY account balance, but only if paid immediately to Defendants.
- Defendants solicit the customer's personal information, including the phone number, credit card number, and last four digits of the customer's social security number.

- The "agent" forces a multifactor authentication code to be sent to the phone associated with the account.

- With the personal information provided by the tricked customer, Defendants access their XFINITY account.

- Payment must be made by phone with credit or prepaid cards, bank account info or via a texted PayPal link using CashApp or Zelle.

- The customers' payments were not made to their XFINITY accounts.

52.    The fraud reports provided by XFINITY customers detail Defendants' actions. For example, one XFINITY customer reported that on September 5 and October 2, 2023, she made two payments of approximately $175.81 each. The first time she spoke with an "agent" claiming to be "Daniel Parker;" the second time she spoke with "Justin." Daniel Parker assured the customer that her payment would go to Comcast and she would receive a confirmation message; neither of her payments went to Comcast and she did not receive confirmations. The "agent," who provided Defendants' main number as his "direct line," obtained personal information from the XFINITY customer.

53.    Another XFINITY customer, who received a call from Defendants using their 430.255.9695 number, was told that he owed Comcast $146.30 and Defendants demanded immediate payment. The "agent" told him that he would receive a text message with a link to make payment.

54.    Other XFINITY customers reported that they had been convinced to make a payment to Defendants for their XFINITY service, however, instead of the customers' legitimate payments, the accounts reflected Defendants had made a series of micropayments on various credit cards and reversed check payments on accounts that did not belong to the customers.

55.    In addition to customer reports to XFINITY, Defendants' fraudulent activities are also reported on scammer.info and youmail.com. For example:

56. Defendants use their phone numbers, websites, and companies interchangeably and as co-conspirators to further their Imposter Fraud Scheme and frequently change or add new phone numbers, websites, and company names to conceal their unlawful activities and hide assets.

57. Defendants and their co-conspirators utilize numerous individuals and companies throughout the United States and around the world to conduct their Imposter Fraud Scheme and, by the complex nature of a fraud scheme, their unlawful transactions are concealed. As such, discovery in the United States and overseas, including third party depositions and written discovery, will be necessary to identify all of Defendants' co-conspirators, determine the extent of their unlawful activities, and to quantify the totality of harm they caused XFINITY, its customers, and United States consumers.

**SUBSTANTIAL HARM CAUSED BY DEFENDANTS' MISCONDUCT**

58. Defendants' actions substantially harm XFINITY in several ways, including *inter alia*: (1) Defendants' actions seriously and irreparably interfere with XFINITY's relationships with its customers and partners; (2) Defendants' false advertising and infringement of the Comcast and XFINITY names and XFINITY Marks cause significant ongoing and irreparable losses and harm to XFINITY's goodwill, image, and reputation; (3) XFINITY is deprived of the opportunity to earn profits by providing products and services to and collecting payments from legitimate XFINITY customers; (4) impersonation of XFINITY by Defendants and their co-conspirators

leads to baseless legal claims, which XFINITY has to defend; and (5) Defendants' misconduct and the harm it causes undermines XFINITY's competitive position in the digital entertainment, cable, and telecommunications industries.

59.      In addition, Defendants' and their co-conspirators' Imposter Fraud Scheme results in calls, emails, and instant messaging by confused and angry consumers to XFINITY's Customer Care department. XFINITY incurs significant costs associated with responding to, investigating, and attempting to resolve customer relations issues created by Defendants. In the process, XFINITY loses customers or potential customers who responded to Defendants' fraudulent offers, and its reputation suffers from this Imposter Fraud Scheme. XFINITY also suffers irreparable harm when confused consumers, relying on misrepresentations by Defendants and/or their co-conspirators, look to XFINITY to resolve their complaints, including reimbursing them for the money they lost or honoring the illusory promotions Defendants and/or their co-conspirators promised.

60.      Defendants' continuing conduct results in substantial harm to XFINITY's business reputation and goodwill, a greater likelihood of confusion, mistake, and deception as to the source of origin of XFINITY products and services unlawfully advertised by Defendants, and confusion as to what, if any, relationship exists between XFINITY and Defendants.

## COUNT ONE
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

61.      XFINITY reasserts the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

62.      A business relationship, and an expectancy of business relationships, exists between XFINITY and the purchasers and prospective purchasers of its XFINITY products and services.

63.      There is a reasonable probability that XFINITY and the prospective purchasers of XFINITY products and services would have entered into a business relationship. Prospective purchasers are induced by Defendants' scam to purchase purported XFINITY products and services.

64.      There is a high probability of future economic benefit to XFINITY from these current and prospective business relationships.

65.    Defendants know of, rely on, and intentionally and unjustifiably interfere with current and prospective business relationships between XFINITY and legitimate XFINITY customers and prospective customers.

66.    Defendants interfered with these relationships by engaging in their Imposter Fraud Scheme, which includes promising free or substantially discounted XFINITY products and services and discounted bill pay services, and upgraded equipment, with no intention of providing the products or services.

67.    Defendants are intentionally interfering with XFINITY's business relationships and prospective relationships through improper means and in violation of the law. Their conduct in doing so is independently tortious because it constitutes, among other things, fraud, conspiracy, and infringement.

68.    Defendants engage in the acts of interference set forth herein with a conscious desire to prevent the business relationships from occurring or continuing or Defendants knew that the interference was certain or substantially certain to occur from their conduct.

69.    Defendants' acts continue to injure XFINITY's prospective business relationships.

70.    XFINITY has been and continues to be proximately damaged from Defendants' interference with its existing or potential customer relationships.

71.    There is no adequate remedy at law to fully compensate XFINITY for the harm caused by Defendants' tortious interference.

**COUNT TWO**
**TORTIOUS INTERFERENCE WITH CONTRACT**

72.    XFINITY reasserts the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

73.    A valid and enforceable contractual relationship exists between XFINITY and its customers, the purchasers of its XFINITY products and services. The contract requires, in part, that XFINITY customers pay an agreed-upon monthly fee for the products and/or services provided by XFINITY.

74.    Defendants willfully, intentionally and unjustifiably interfere with, and/or knowingly facilitate a conspiracy to interfere with, these contracts between XFINITY and legitimate XFINITY customers.

75.    Defendants and their co-conspirators rely on and exploit the contractual relationship between XFINITY and its customers to unlawfully obtain money and/or prepaid and credit cards based on the false promise of discounted or free XFINITY products, services or account balances or equipment upgrades. Defendants interfere with these relationships by engaging in the Imposter Fraud Scheme and causing XFINITY customers to fail to make timely account payments and/or to doubt or resent their relationship with XFINITY and to terminate their agreements.

76.    Defendants engaged in the acts of unjustifiable interference set forth herein with a conscious desire to induce breach of contract, or Defendants knew that breach of contract was certain or substantially certain to occur as a result of their conduct, defrauding XFINITY customers under the guise of XFINITY.

77.    Defendants' acts are not motivated by legitimate business reasons.

78.    XFINITY has been proximately damaged and continues to be damaged by Defendants' interference.

79.    There is no adequate remedy at law to fully compensate XFINITY for the harm caused by Defendants' tortious interference.

**COUNT THREE**
**CIVIL CONSPIRACY**

80.    Plaintiffs reassert the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

81.    An agreement and conspiracy existed and continues to exist between and among Defendants and other co-conspirators to perform the following unlawful acts:

    a.   impersonate XFINITY to the public;

    b.   impersonate XFINITY customers to XFINITY;

c.   contact existing or potential XFINITY customers to offer them free or significantly discounted XFINITY products or services in exchange for money (knowing that no services or products will be provided);

d.   gain access and make changes to accounts on XFINITY's protected computers with illegally obtained customer information from defrauded customers:

e.   steal payments from XFINITY customers due to XFINITY for services and products provided by XFINITY to the customers;

f.   launder the payments into cash; and/or

g.   resell credit card, checking, and customer information obtained from XFINITY customers.

82.    Defendants' actions constitute fraud, unfair competition, tortious interference with business relationships and prospective advantage, tortious interference with contract, unjust enrichment, trademark infringement, false advertising, and violation of the federal Computer Fraud and Abuse Act, among other things.

83.    Each Defendant knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy, as set forth with more particularity *supra*.

84.    From inception, each Defendant was aware of the intended harm to XFINITY and its customers.

85.    Plaintiffs have been and continue to be proximately damaged by the conspiracy and Defendants' tortious actions in furtherance thereof.

86.    There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by Defendants' conspiracy.

87.    Defendants, directly or indirectly through co-conspirators, regularly and systematically misrepresented and made fraudulent statements to Plaintiffs that they were legitimate account holders or other persons lawfully authorized to access and/or make changes to customer accounts, as well as making false representations to Plaintiffs' customers.

88. Pursuant to Sections 41.001 *et seq*. of the Texas Civil Practice and Remedies Code, punitive damages from each Defendant, in an amount to be determined by this Court, are warranted in this case.

**COUNT FOUR**
**UNJUST ENRICHMENT**

89. Plaintiffs reassert the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

90. By masquerading as XFINITY and using the XFINITY Marks to unlawfully sell and collect payment for XFINITY products and services, Defendants have fraudulently obtained and secured benefits from Plaintiffs that cause significant harm to Plaintiffs and result in significant financial gain to Defendants.

91. Defendants acquired the benefits of fraudulently impersonating Plaintiffs voluntarily and with full knowledge of and intent to reap those benefits.

92. Defendants have retained the benefits under such circumstances that make it unjust and inequitable for Defendants to retain the benefits without paying Plaintiffs the value of the benefits acquired by Defendants.

93. There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by Defendants' unjust enrichment.

**COUNT FIVE**
**UNFAIR COMPETITION**

94. Plaintiffs reassert the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

95. Defendants have and continue to enrich themselves by impersonating XFINITY, contacting existing or potential XFINITY customers, offering free or significantly discounted XFINITY services or products and discounted account payments, taking their money or prepaid or credit cards, and failing to provide the promised XFINITY services, products or account credits, which constitutes unfair competition under the common law of the State of Texas.

96.    Defendants' conduct and participation in the Imposter Fraud Scheme constitutes unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in violation of state law.

97.    Defendants' use of the XFINITY Marks in connection with the Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' products and services, and the relationship between Plaintiffs and Defendants. Thus, Defendants have also engaged in unfair competition with Plaintiffs by selling and/or offering, and promoting their fake XFINITY services with the intention of trading upon the goodwill established by Plaintiffs and are thereby misappropriating the benefits of substantial effort and money expended by Plaintiffs in establishing Plaintiffs' rights in and to the XFINITY Marks.

98.    Defendants' conduct complained of herein was and continues to be intentional, malicious, and willful, and has caused substantial harm to XFINITY.

99.    There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by Defendants' unfair competition.

**COUNT SIX**
**TRAFFICKING IN COMPUTER PASSWORDS**
**18 U.S.C. § 1030(a)(6)**

100.    XFINITY reasserts the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

101.    XFINITY has the following computers: (1) password-protected ordering system; (2) national communications and computer networks; and (3) electronic customer account and billing portal (collectively, "Protected Computers"). The Protected Computers are "computers" as that term is defined in Section 1030(e)(1) of the Computer Fraud and Abuse Act because they are electronic and/or high-speed data processing devices performing logical, arithmetic or storage functions, and include data storage facilities and/or communications facilities directly related to or operating in conjunction with such devices.

102.    XFINITY prevents unauthorized access to its Protected Computers through, among other things, the confidential codes/passwords needed to access the Protected Computers ("Security Codes").

103.    Defendants and/or their co-conspirators obtain these Security Codes through various unlawful means, including the Dark Web, socially engineering consumers, and identity theft.

104.    Through their Imposter Fraud Scheme, Defendants are knowingly trafficking in the Security Codes with the intent to defraud and harm XFINITY.

105.    Defendants and their co-conspirators use the fraudulently-obtained Security Codes to gain unauthorized access to at least one of XFINITY's Protected Computers (*i.e.*, using Security Codes fraudulently obtained from third-party sources like the Dark Web, socially-engineered consumers authorizing multifactor authentication, and identity theft to log into XFINITY password protected ordering systems and/or the XFINITY electronic customer account and billing portal to make changes to a customer's XFINITY account).  This access into at least one of XFINITY's Protected Computers as part of the Imposter Fraud Scheme is not authorized.

106.    Defendants or their co-conspirators share these Security Codes among themselves and with their co-conspirators.

107.    Defendants' transfer of the Security Codes to others constitutes "trafficking" of the codes as defined in 18 U.S.C. § 1029 in that the Security Codes were transferred, or otherwise disposed of, to others, or Defendants obtained control of the codes with intent to transfer or dispose of them.

108.    Defendants' trafficking of the Security Codes substantially affects interstate commerce and communication in that the Security Codes are trafficked over the Internet, throughout the United States, and around the world, and XFINITY's Protected Computers are used in and affect interstate commerce and communication.

109.    Defendants' unlawful trafficking of XFINITY's Security Codes has caused and will continue to cause XFINITY to suffer injury, with "damages" and "losses" – as those terms are

defined in Sections 1030(e)(8) and 1030(e)(11), respectively -- substantially in excess of $5,000 over a one-year period.

110.    With respect to loss, XFINITY has spent in excess of $5,000 over a one-year period assessing its Protected Computers for damage and taking steps to prevent future unauthorized access by Defendants and/or their co-conspirators.

111.    With respect to loss, XFINITY has also spent in excess of $5,000 over a one-year period, investigating Defendants' intrusions into XFINITY's Protected Computers, assessing the possible impairment to the integrity of its Protected Computers, and conducting damage assessments regarding Defendants' collection and dissemination of Security Codes.

112.    Moreover, with respect to loss, XFINITY has spent in excess of $5,000 over a one-year period in costs to discover Defendants' identities and/or the method by which Defendants access XFINITY's Protected Computers without authorization.

113.    With respect to damage, by unlawfully accessing XFINITY's Protected Computers and collecting and disseminating the illegally acquired Security Codes, Defendants and their co-conspirators have substantially impaired the integrity of XFINITY's Protected Computers in an amount in excess of $5,000. Moreover, Defendants' actions have impaired XFINITY's means of controlling the quality of its products and services.

114.    Defendants' activities constitute trafficking in computer passwords in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6).

115.    Defendants' conduct is intentional, malicious, fraudulent, and willful.

116.    Pursuant to 18 U.S.C. § 1030(g), XFINITY is entitled to maintain this civil action against Defendants to obtain compensatory damages and injunctive and other equitable relief for the reasons identified above, and because Defendants' conduct involves at least one of the factors identified in 18 U.S.C. § 1030(c)(4)(A)(i), including the factor set forth in subclause (I): the loss to XFINITY and XFINITY customers as a result of Defendants' conduct during any one-year period aggregated at least $5,000 in value.

**COUNT SEVEN**
**UNAUTHORIZED ACCESS**
**18 U.S.C. § 1030(a)(5)(C)**

117. XFINITY reasserts the allegations set forth in Paragraphs 1-60 and 101-116 as though fully set forth herein.

118. XFINITY's Protected Computers are "protected computers" as that term is defined in Section 1030(e)(2)(B) of the Computer Fraud and Abuse Act because they are used in interstate commerce and communications.

119. XFINITY's Protected Computers hold confidential information, are connected to the Internet, and assist in providing federally-regulated communications services.

120. In furtherance of their Imposter Fraud Scheme, Defendants and/or their co-conspirators use fraud and misrepresentation to access at least one of XFINITY's Protected Computers. As such, Defendants' access to XFINITY's Protected Computers using fraudulently obtained credentials or identities is unauthorized. Further, in using fraud or deception to access customer accounts and/or XFINITY's billing systems, Defendants' and/or their co-conspirators' access at least one of XFINITY's Protected Computers is unauthorized.

121. Defendants' unauthorized access of XFINITY's Protected Computers has caused and will continue to cause XFINITY to suffer injury, with "damages" and "losses" – as those terms are defined in Sections 1030(e)(8) and 1030(e)(11), respectively – substantially in excess of $5,000 over a one-year period.

122. Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(C).

**COUNT EIGHT**
**UNAUTHORIZED ACCESS WITH INTENT TO DEFRAUD**
**18 U.S.C. § 1030(a)(4)**

123. XFINITY reasserts the allegations set forth in Paragraphs 1-60 and 101-122 as though fully set forth herein.

124. Defendants knowingly, intentionally, and with the intent to defraud, facilitate the unauthorized access into at least one of XFINITY's Protected Computers.

125. Defendants and their co-conspirators obtain monetary value through their unlawful access into at least one of XFINITY's Protected Computers.

126. Defendants' activities constitute unauthorized access in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

**COUNT NINE**
**FEDERAL TRADEMARK INFRINGEMENT**
**15 U.S.C. 1114 [§32(1) of the Lanham Act]**

127. Comcast Corporation reasserts the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

128. Defendants' aforementioned conduct constitutes use of certain federally registered XFINITY Marks without authorization in connection with their Imposter Fraud Scheme.

129. Defendants' use of certain federally registered XFINITY Marks in connection with their Imposter Fraud Scheme has caused, and will continue to cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between Comcast Corporation and Defendants.

130. Defendants' unauthorized use of certain federally registered XFINITY Marks is likely to continue in the future, causing irreparable damage to the business, reputation and goodwill of Comcast Corporation.

131. Defendants' use of certain federally registered XFINITY Marks in connection with their Imposter Fraud Scheme constitutes a misappropriation of Comcast Corporation's distinguishing and identifying federally registered trademarks that were created through significant effort and expense by Comcast Corporation, and its authorized licensees, over a long period of time.

132. Defendants' use of certain federally registered XFINITY Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Comcast Corporation or its authorized licensees. It is likely to mislead the public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Comcast Corporation or its authorized licensees.

133. Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Comcast Corporation and the reputation and goodwill of Comcast Corporation, and have been unjustly enriched and will continue to unjustly enrich themselves at the expense of Comcast Corporation.

134. Comcast Corporation is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

135. Defendants' aforesaid acts constitute willful infringement of Comcast Corporation's aforementioned federally registered trademarks in violation of 15 U.S.C. §1114.

136. Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, warranting an assessment of exemplary damages and an award of, *inter alia*, Comcast Corporation's lost profits, Defendants' gross profits, and Comcast Corporation's attorneys' fees. Defendants' conduct also warrants a finding that this is an exceptional case.

**COUNT TEN**
**FEDERAL COMMON LAW TRADEMARK**
**INFRINGEMENT AND FALSE ADVERTISING**
**15 U.S.C. § 1125 (a)(1)(A) and (B) [§43(a) of the Lanham Act]**

137. Plaintiffs reassert the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

138. Defendants' aforementioned conduct constitutes use of at least one of the XFINITY Marks without authorization in connection with their Imposter Fraud Scheme.

139. Defendants' use of at least one of the XFINITY Marks in connection with their Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake and deception as to the source of origin of Defendants' infringing products, and the relationship between XFINITY and Defendants.

140. Defendants' unauthorized use of at least one of the XFINITY Marks is likely to continue in the future, causing irreparable damage to the business, reputation and goodwill of Plaintiffs.

141.    Defendants' use of at least one of the XFINITY Marks in connection with their Imposter Fraud Scheme constitutes a misappropriation of Plaintiffs' distinguishing and identifying trademarks that were created through significant effort and expense by Plaintiffs over a long period of time.

142.    Defendants' use of at least one of the XFINITY Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products and business of Defendants have some connection, association or affiliation with Plaintiffs.  It is likely to mislead the public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Plaintiffs.

143.    Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Plaintiffs and the reputation and goodwill of Plaintiffs, and have been unjustly enriched and will continue to unjustly enrich themselves at Plaintiffs' expense.

144.    Plaintiffs are without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

145.    Defendants' use of at least one of the XFINITY Marks in commercial advertising and/or promotion misrepresents the nature, characteristics, and/or qualities of their infringing products and/or services.  Such advertising and/or promotion is false and/or misleading and deceives, or has the capacity to deceive, consumers.  The deception and misrepresentations have a material effect on purchasing decisions and affect interstate commerce.

146.    Defendants' activities constitute false designation of origin, false descriptions and representations, and false advertising in commerce in violation of § 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B).

147.    Defendants knew or should have known that they have no legal right to use the XFINITY Marks.

148.    Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*,

Plaintiffs' lost profits, Defendants' gross profits, the cost of corrective advertising, and Plaintiffs' attorneys' fees. Defendants' conduct also warrants a finding that this is an exceptional case.

**COUNT ELEVEN**
**CONTRIBUTORY TRADEMARK INFRINGEMENT**

149. Plaintiffs reassert the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

150. By misappropriating and using at least one of the XFINITY Marks, Defendants knowingly aid and enable distributors and/or sellers of their products and services to market them to members of the general public in a way that infringes the XFINITY Marks by placing in the hands of distributors and/or sellers an instrument of consumer deception.

151. Defendants' unlawful, unauthorized, and unlicensed advertising and/or sale of XFINITY products and services has contributed to the creation of express and implied misrepresentations that the products and services sold by Defendants and/or their co-conspirators, were created, authorized or approved by Plaintiffs.

152. Defendants' conduct leads to post-sale confusion by causing consumers in the United States who purchase products or services from Defendants or their co-conspirators to believe that they are purchasing legitimate XFINITY products or services.

153. Defendants' conduct constitutes contributory infringement in violation of the Trademark Act. Defendants' conduct is intentional, malicious, and willful.

154. Plaintiffs have been damaged and continue to suffer damage as a result of Defendants' Imposter Fraud Scheme.

155. There is no adequate remedy at law to fully compensate Plaintiffs for the harm caused by Defendants' Imposter Fraud Scheme.

156. Plaintiffs are without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

157. Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an

award of, *inter alia*, Plaintiffs' lost profits, Defendants' gross profits, and Plaintiffs' attorneys' fees. Defendants' conduct also warrants a finding that this is an exceptional case.

**COUNT TWELVE**
**FEDERAL TRADEMARK DILUTION**
**15 U.S.C. § 1125 (c) [Lanham Act §43(c)]**

158. Comcast Corporation reasserts the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

159. The XFINITY Marks are distinctive and famous marks within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

160. The XFINITY Marks are famous throughout Texas and the United States.

161. The XFINITY Marks became distinctive and famous prior to the Defendants' use of their infringing marks and acts, as alleged herein.

162. Defendants' acts, as alleged herein, have diluted and will, unless enjoined, continue to dilute and are likely to dilute the distinctive quality of Comcast Corporation's famous Marks.

163. Defendants' acts, as alleged herein, have tarnished and will, unless enjoined, continue to tarnish, and are likely to tarnish the XFINITY Marks by undermining and damaging the valuable goodwill associated therewith.

164. Defendants' acts, as alleged herein, are intentional and willful, in violation of Section 43(c)(1) of the Lanham Act.

165. Comcast Corporation is without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

166. Defendants are engaged in and continue to engage in the alleged activities knowingly, willfully and deliberately, justifying the assessment of exemplary damages and an award of, *inter alia*, Comcast Corporation's lost profits, Defendants' gross profits, and Comcast Corporation's attorneys' fees. Defendants' conduct also warrants a finding that this is an exceptional case.

**COUNT THIRTEEN**
**COMMON LAW TRADEMARK INFRINGEMENT**

167. Plaintiffs reassert the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

168. Defendants' aforementioned conduct constitutes use of at least one of the XFINITY Marks without authorization in connection with their Imposter Fraud Scheme.

169. Defendants' use of at least one of the XFINITY Marks in connection with their Imposter Fraud Scheme has caused, and will further cause, a likelihood of confusion, mistake, and deception as to the source of origin of Defendants' infringing products and the relationship between Plaintiffs and Defendants.

170. Defendants' unauthorized use of at least one of the XFINITY Marks is likely to continue in the future, all to the great and irreparable damage to Plaintiffs.

171. Defendants' use of at least one of the XFINITY Marks in connection with their Imposter Fraud Scheme constitutes a misappropriation of Plaintiffs' distinguishing and identifying trademarks that were created through significant effort and expense by Plaintiffs over a long period of time.

172. Defendants' use of at least one of the XFINITY Marks evokes an immediate, favorable impression or association and constitutes a false representation that the products, services, and business of Defendants have some connection, association or affiliation with Plaintiffs. It is intended to mislead the trade and public into believing that Defendants' products and services originate from, are affiliated with, or are sponsored, authorized, approved or sanctioned by Plaintiffs.

173. Defendants, in committing the foregoing acts in commerce, have damaged, and will continue to damage, Plaintiffs and the reputation and goodwill of Plaintiffs, and have been unjustly enriched and will continue to unjustly enrich themselves at Plaintiffs' expense.

174. Plaintiffs are without an adequate remedy at law to redress such acts, and will be irreparably damaged unless Defendants are preliminarily and, thereafter, permanently enjoined from committing and continuing to commit such acts.

175. Defendants' activities constitute common law trademark infringement under the laws of the State of Texas.

176. Defendants knew or should have known that they have no legal right to use the XFINITY Marks.

177. Plaintiffs are entitled to exemplary and punitive damages by reason of Defendants' willful, reckless, deliberate, and intentional conduct.

**COUNT FOURTEEN**
**COMMON LAW FRAUD AND FRAUDULENT MISREPRESENTATION**

178. XFINITY reasserts the allegations set forth in Paragraphs 1-60 as though fully set forth herein.

179. As part of the Imposter Fraud Scheme, each of the Defendants, directly or indirectly through co-conspirators, regularly and systematically misrepresents and makes fraudulent statements to XFINITY that they are legitimate XFINITY account holders or other persons lawfully authorized to access and/or make changes to XFINITY customer accounts.

180. The nature of the Scheme requires Defendants to make false representations to both XFINITY and its customers. In each instance, to add credibility to their Scheme, after deceiving XFINITY customers into providing their confidential account information and/or authoring multifactor authentication requests, Defendants transmit that information to XFINITY, posing as the customer or a legitimately authorized representative of the customer.

181. As described *supra*, Defendants began routinely masquerading as XFINITY to XFINITY customers since at least October 2023, then, using information obtained from the customers, they falsely represent to XFINITY that they are or are lawfully authorized by those XFINITY customers to access, and in some cases, make changes to or order equipment on, customer accounts. As another example, on November 14 and 15, 2023, Defendants falsely represented themselves as XFINITY, collected identifying information from an investigator for XFINITY, including phone and account numbers and directed the investigator to approve a multifactor authentication request, and then Defendants presented that information and falsely-obtained authorization to XFINITY to access the investigator's XFINITY accounts.

182. Defendants know that their material misrepresentations to XFINITY and XFINITY customers are false.

183. Each Defendant participates in intentionally defrauding XFINITY and its legitimate customers to conduct the Imposter Fraud Scheme.

184. Defendants intend for XFINITY and existing or potential customers to rely on their misrepresentations, and/or the misrepresentations of their co-conspirators.

185. XFINITY's reliance on the misrepresentations of Defendants and their co-conspirators was reasonable under the circumstances, namely, because Defendants had the account verification information or multifactor authentication approval from the account holder that allowed them to access one or more of XFINITY's Protected Computers for improper purposes.

186. XFINITY has been damaged and continues to suffer damages as a result of Defendants' actions.

187. There is no adequate remedy at law to fully compensate XFINITY for the harm caused by Defendants' fraud.

188. Pursuant to Sections 41.001 *et seq*. of the Texas Civil Practice and Remedies Code, punitive damages from each Defendant, in an amount to be determined by this Court, are warranted in this case.

**INJUNCTIVE RELIEF**

189. "Where express authority for issuance of statutory injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional 'equitable' prerequisites of such relief, so long as the statutory conditions are met." *CSC Holdings, Inc. v. New Info. Techs., Inc*., 148 F. Supp. 2d 755, 763 (N.D. Tex. 2001).

190. XFINITY does not need to establish the traditional elements of harm to obtain a permanent injunction under the Lanham Act and Computer Fraud and Abuse Act. Specifically, 15 U.S.C. § 1116(a) provides courts the power to grant injunctions upon such terms they deem reasonable "to prevent the violation of any right of the registrant of a mark registered in the Patent

and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." Similarly, 18 U.S.C. § 1030(g) provides that anyone who suffers damage or loss by reason of a violation of the Computer Fraud and Abuse Act may obtain injunctive relief.

191.    In the alternative, an injunction is warranted here under traditional equitable standards. A permanent injunction is proper if the plaintiff shows: "(1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021).

192.    As described in detail in Paragraphs 5, 8, 33-37, and 58-60, *supra*, Defendants are perpetrating and profiting off an imposter fraud scheme aimed at defrauding XFINITY and its customers, and, in so doing, are infringing on the XFINITY marks and accessing and making unauthorized changes in XFINITY computers.

193.    As described in detail in Paragraphs 58-60, *supra*, XFINITY is substantially and irreparably harmed by Defendants imposter fraud scheme.

194.    The harm to XFINITY outweighs any harm to Defendants from a permanent injunction. Indeed, there will be no injury to Defendants at all given that the law already prohibits Defendants from their fraudulent conduct; in fact, law enforcement across the country expends much resources in attempt to put a stop to these fraudulent imposter schemes.  To the extent Defendants should allege any harm, it is self-inflicted.

195.    The public interest will not be disserved by an injunction. Rather, it is in the public interest Defendants be prevented from their continued fraud on Plaintiffs' customers.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all triable issues.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter the following relief:

(a) judgment against Defendants and in favor of Plaintiffs on all claims;

(b) a finding that Defendants' acts and participation in the Scheme were willful, intentional, and/or in malicious disregard of Plaintiffs' lawfully protected rights;

(c) an order awarding Plaintiffs their compensatory, consequential, statutory, special, treble, exemplary, and punitive damages including, without limitation, their lost profits, loss of goodwill, and damage to their reputation, cost of corrective advertising, Defendants' gross profits, as provided by law, together with pre and post-judgment interest;

(d) a preliminary and, thereafter, permanent injunction that includes, but is not limited to, enjoining Defendants and all of their past and present agents, representatives, officers, directors, successors, assigns, parents, subsidiaries, affiliates, related companies, predecessors-in-interest, employees, heirs, personal representatives, beneficiaries, relatives, and all other persons or entities acting or purporting to act for them or on their behalf, including, but not limited to, any corporation, partnership, proprietorship or entity that is affiliated or associated with Defendants or Defendants' representatives, agents, assigns, parent entities, employees, independent contractors, associates, servants, affiliated entities, and any and all persons and entities in active concert and participation with Defendants who receive notice of the injunction from:

i. engaging in or soliciting, directing, requesting, or facilitating others to engage in the conduct described in the Complaint as the Imposter Fraud Scheme against XFINITY and its actual and potential customers;

ii. holding themselves out as being associated with, employed by or on behalf of, or acting as an agent, representative, affiliate, contractor or authorized partner of XFINITY or facilitating or knowingly assisting other persons or entities to do so;

iii. contacting existing or potential XFINITY customers by phone, email, text message, voicemail or any other method with the intent to engage in any aspect of the Imposter Fraud Scheme;

iv.    acquiring, advertising or selling any Comcast and/or XFINITY products or services;

v.    soliciting, accepting, retaining or transmitting any payment, in whatever form, from an XFINITY customer, including but not limited to, payments intended to be made to XFINITY for a new or existing XFINITY account;

vi.    laundering any prepaid or credit card payment received in connection with the Imposter Fraud Scheme;

vii.    advertising, using, selling or otherwise sharing or transmitting XFINITY customer credit card, check or other financial information;

viii.    attempting to or accessing XFINITY's Protected Computer System–as defined in the Complaint–including, but not limited to, through protected and confidential computer passwords or multifactor authentication obtained by defrauding consumers, purchasing or otherwise acquiring the information on the dark web or by any other means;

ix.    acquiring, purchasing, selling, advertising, aggregating, supplying, and/or soliciting, directly or indirectly, actual or potential XFINITY customer information, XFINITY account information or the confidential codes/passwords needed to access XFINITY's Protected Computers;

x.    communicating with employees or representatives of XFINITY, whether in person, by phone, through a website or via a third party;

xi.    advertising for, soliciting or compensating individuals to engage in the Imposter Fraud Scheme;

xii.    training, educating, coaching, guiding, or instructing anyone on methods to defraud XFINITY or its actual or potential customers;

xiii.    misappropriating that which rightfully belongs to XFINITY, its customers, or potential customers, or in which XFINITY or its customers or potential customers have an interest;

xiv. using the XFINITY Marks or any other trademark, service mark, trade name and/or trade dress owned or used by XFINITY or its subsidiaries, parents, and affiliates, now or in the future, or that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the XFINITY's Marks without XFINITY's prior written authorization;

xv. engaging in any activity that infringes XFINITY's rights in or is likely to dilute the distinctiveness of the XFINITY Marks;

xvi. engaging in unfair competition with XFINITY;

xvii. making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (i) Defendants' products or services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with XFINITY, or (ii) XFINITY's products or services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected with Defendants;

xviii. using, or authorizing any third party to use, in connection with business, goods or services, a false description, representation or designation of origin, or any marks, names, words, symbols, devices or trade dress that falsely associates such business, goods, and/or services with XFINITY, or tends to do so; and

xix. Receiving any compensation, directly or indirectly, whether in money, in kind, or otherwise, for any of the acts proscribed in subparagraphs above;

(e) an order requiring Defendants to remove all offending websites and online offers of and deliver to XFINITY all materials, electronic or otherwise, in the possession of Defendants, bearing any of the XFINITY Marks or any reproduction, counterfeit, copy, or colorable imitation thereof, and all means of making the same;

(f) an order requiring Defendants, their agents, servants, employees, successors and assigns, and all other persons acting in concert or conspiracy or otherwise affiliated with Defendants to engage in corrective advertising, as necessary;

(g) an order finding that this is an exceptional case under the Lanham Act;

(h) an order awarding Plaintiffs their costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a), and any other applicable provision of law; and,

(i) such other or further relief as the Court may deem just and proper.

Dated: March 12, 2025

Respectfully submitted,

/s/ Frederick W. Addison, III

Frederick W. Addison, III
State Bar No. 00903350
raddison@munsch.com
Jordan R. Curry
State Bar No. 24116242
jcurry@munsch.com
Munsch Hardt Kopf & Harr P.C.
500 N. Akard Street
Suite 4000
Dallas, Texas 75201
Tel: 214-855-7500
Fax: 214-855-7584

Stacey K. Sutton (*pro hac vice forthcoming)*
Amanda R. Jesteadt (*pro hac vice forthcoming)*
Kathleen C. Cooperstein (*pro hac vice forthcoming*)
Wiley Rein LLP
2050 M St NW
Washington, DC 20036
Tel: (202) 719-7000
ssutton@wiley.law
ajesteadt@wiley.law
kcooperstein@wiley.law

Counsel for Plaintiffs Comcast Cable Communications, LLC d/b/a XFINITY and Comcast Corporation